Robert John
Law Office of Robert John
P.O. Box 73570
Fairbanks, AK 99707
907-456-6056/907-456-6057 (FAX)
Attorney for Damien Mingarelli

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | D.C. No. 3:10-CR-00108-RRB-DMS |
| | ) | District of Alaska, Anchorage |
| v. | ) | |
| | ) | |
| DAMIEN MINGARELLI, and | ) | **DEFENDANT DAMIEN MICHAEL** |
| ALONZO YOUNG, III, | ) | **MINGARELLI'S SENTENCING** |
| | ) | **MEMORANDUM** |
| Defendants. | ) | |
| _____ | ) | |

I.  **DAMIEN MINGARELLI 'S CALCULATION OF THE
    SENTENCING GUIDELINES RANGE**

Damien Mingarelli (Mingarelli) disagrees with various factual allegations in the

Presentence Report (PSR) and with the Sentencing Guidelines range calculated in the

PSR.  Mingarelli's disagreements, reasoning, and calculations are as follows.

As to Point 8 of the PSR (Point 8), it is merely coincidental that Tashia Kaplan

opened a bank account the same day as Mingarelli.  Based upon the information set forth

at Point 20, it is apparent that Kaplan had her own independent dealings with people in

Alaska.

As to Point 15, Mingarelli objects to the statement that "Standefer estimated that 90 percent of the money he sent was on behalf of Young."  It is unclear whether that refers to money sent to Mingarelli or to money sent to a source in Hawaii.  The statement is incorrect as to Mingarelli.  Moreover, Mingarelli had no control over the decisions of Young or Standefer or anyone else to employ people to send money to Mingarelli.

As to Point 16, Mingarelli did not steal Summer Peppler from Alonzo Young. Mingarelli and Peppler developed a mutual attraction and affection for each other. Mingarelli is not aware of any conversations between Peppler and Standefer. Furthermore, Mingarelli never shipped any methamphetamine to Fairbanks.

As to Point 18, Mingarelli did not state that he mailed two hundred 80 mg pills per week.  Likewise, Mingarelli did not state that he sent a minimum of 5000 oxycodone pills to Alaska.

As to Point 19, Mingarelli did not state that he and Tashia Kaplan were working together.  Instead, Mingarelli stated the other people, particularly Dana Vernola and Tashia Kaplan, have their own separate involvement.  Mingarelli did not state that anyone, other than his sister Amber Mingarelli, picked up money on his behalf.  In addition, Amber Mingarelli did not know what the money was for or from.

As to Point 20, numerous transactions are improperly included.  Mingarelli objects to the inclusion of: the February 8, 2009 transaction from Collins to Vernola in the amount of $1410.00; the February 21, 2009 transaction from Young to Vernola in the amount of $1240.00; the February 25, 2009 transaction from G. Solo to Vernola in the amount of $5000.00; the March 7, 2009 transaction from Baker to Vernola in the amount

of $8390.00; the March 14, 2009 transaction from Collins to F. Diaz in the amount of $6030.00; the March 30, 2009 transaction from Unknown to Mingarelli in the amount of $400.00; the March 30, 2009 transaction from Collins to Vernola in the amount of $1000.00; the April 5, 2009 transaction from Baker to Vernola in the amount of $1000.00; the April 10, 2009 transaction from Vernola to G. Maxwell in the amount of $5000.00; the April 26, 2009 transaction from Standefer to Vernola; and the April 26, 2009 transaction from Deweese to Vernola.

As to Point 21, the amount of the transactions improperly included in Point 20 is $33,825.00. Thus, the correct total in Point 21 is $107,716.36. For the same reasons, the amount sent or deposited by Young must be reduced by $1240.00, the amount of the February 21, 2009 transaction from Young to Vernola in Point 20.

As to Point 26, Mingarelli objects to the Base Offense Level being calculated under U.S.S.G. §2S1.1(a)(1) instead of (a)(2). In this case it is impossible or impracticable to determine the offense level under (a)(1); thus, the Base Offense Level should be determined under (a)(2). See U.S.S.G. §2S1.1, Commentary 3. Moreover, since Standefer and Deweese have had their sentences determined under money-laundering and have accordingly received relatively short sentences (and Young may well receive the same), it is arbitrary to then calculate Mingarelli's base level under (a)(1), resulting in a Guidelines calculation that is disproportionately long in view of the circumstances. The proper base level under (a)(2) is 8, plus 8 added for the $107,716.36 amount, a total of 16.

As to Point 27, assuming for the purposes of argument that the methodology there used is proper, the amount of oxycodone should be reduced to 76.10 percent of the indicated amount (the ratio between $107,716.36 and $141,541.65). 1166 kilograms of marijuana times .7610 equals 887 kilograms -- corresponding with level 30. The bigger objection, however, is the arbitrary and otherwise unreasonable change in the Sentencing Guidelines in 2003, Amendment 657, which changed 1 gram of oxycodone from being equated with 500 grams of marijuana to 1 gram of oxycodone being equated with 6700 grams of marijuana -- an increase of 13.4 times. When the kilograms of marijuana equivalent are divided by 13.4, the result is 66 kilograms of marijuana -- corresponding with level 22.[1] As will be discussed further in the Sentencing Factors section of this memorandum, one gram of oxycodone was (prior to 2003) treated the same as one gram of morphine, with both being equated to 500 grams of marijuana. While the Drug Equivalency Tables at §2D1.1(D) still equate to one gram of morphine with 500 grams of marijuana, oxycodone has been arbitrarily elevated 13.4 times so that it is now 6.7 times the equivalent of pure heroin!

As to Point 30, Damien Mingarelli was neither an organizer nor a leader nor a manager nor a supervisor. Those persons to whom he may have sold oxycodone are not participants; nor are those who are unknown facilitators. There should be no points added here.

---

[1] Utilizing the PSR's figure of 1166 kilograms and dividing that by 13.4 results in a figure of 87 kilograms -- corresponding with a Base Offense Level of 24 -- a decrease of 8 from the PSR's Base Offense Level of 32.

As a matter of law, "customers who are solely end users of controlled substances are not participants for the purposes of U.S.S.G. §3B1.1(b)."[2]  Likewise, "[u]nknown facilitators of crimes will not be considered criminally responsible participants."[3]  In this case, the persons referenced in PSR Point 30 fall into one or the other of the above two categories and thus are not considered participants under §3B1.1(b).

Even if any of the persons referenced in PSR Point 30 did qualify as criminally-responsible participants under §3B1.1, the point remains that Mingarelli did not exercise the requisite control over any such person; accordingly, Mingarelli is not an organizer or leader, or even a manager or a supervisor, for the purposes of that Guideline.[4]  As the Court explained in Garcia, where a defendant furnishes a controlled substance and then acts as a creditor awaiting payment, without otherwise controlling the actions of the payees, the defendant is neither an organizer or leader, nor a manager or supervisor, under §3B1.1.[5]  In this case, Mingarelli is no more than a furnisher-creditor who awaited payment by the transfer of money into his bank account.[6]

As to Point 32, the Adjusted Offense Level via the proper calculation pursuant to §2S1.1(a)(2) is the Base Offense Level of 16, plus 6 pursuant to §2S1.1(b)(1), plus 2 pursuant to §2S1.1(b)(2)(B), for an Adjusted Offense Level of 24.  If instead the

---

[2] United States v. Egge, 223 F.3d 1128, 1134 (9th Cir. 2000).
[3] United States v. Luca, 183 F.3d 1018, 1024 (9th Cir. 1999) (brackets added).
[4] See United States v. Garcia, 497 F.3d 964, 969-70 (9th Cir. 2007); Egge, 223 F.3d at 1131-32.
[5] See Garcia, 497 F.3d at 970.
[6] See id.

calculation were to commence under §2S1.1(a)(1), the Base Offense Level increases to 22, thus also resulting in an Adjusted Offense Level of 24.

As to Point 38, the Total Offense Level should be 21.

As to Point 83, the Guidelines Provisions -- based on a total offense level of 21 and a criminal history category of III -- result in a Guidelines imprisonment range of 46 to 57 months.

## II.     SENTENCING FACTORS

As a matter of law, there is no presumption that sentence within the Guidelines range is reasonable.[7]   In this case, a sentence within the Guidelines range is entirely unreasonable.   Instead, as will be discussed below, the departures and other variances applicable in this case, plus the factors enumerated in 18 U.S.C. §3553(a), strongly indicate that the appropriate sentence in this case is a probationary one.

### A.     Departures Under The Sentencing Guidelines And Other Variances From The Sentencing Guidelines

As the law now stands, departures and other variances from the Sentencing Guidelines are no longer viewed strictly under the Guidelines but are instead viewed as an exercise of the Court's discretion in imposing a reasonable sentence.[8]   In that light, Mingarelli will discuss two departures under the Sentencing Guidelines -- a downward departure in view of the interplay between U.S.S.G. §5H1.4 and §5K2.19, based upon Mingarelli's rehabilitation between the time of the offense and the time charges were brought, and a downward departure under U.S.S.G §5H1.6 based upon Mingarelli's

---

[7] United States v. Carty, 520 F.3d 984, 993-94 (9th Cir. 2008) (En Banc).

Case 3:10-cr-00108-RRB    Document 81    Filed 01/20/12    Page 6 of 23

family ties and responsibilities. First, however, Mingarelli will discuss a departure/variance based upon the Sentencing Guidelines having arbitrarily equated one gram of oxycodone with 6700 grams of marijuana, 13.4 grams of morphine, and 6.7 grams of heroin.

### 1. The Arbitrary Treatment Of Oxycodone Under The Sentencing Guidelines

Although the Court's sentencing calculation must begin with reference to the Sentencing Guidelines, the Guidelines are not to be presumed by the Court to suggest a reasonable sentence.[9] Moreover, those guidelines created by the Sentencing Commission which are not based on the "exercise of its characteristic institutional role" -- the study of past sentencing practice and use of updated empirical data -- are due less respect, and the Court cannot fairly assume that the sentencing range represents a rough approximation of a sentence which achieves the purposes of sentencing under 18 U.S.C. § 3553(a).[10] "As far as the law is concerned, the judge could disregard the Guidelines. . . ."[11]

The oxycodone guideline of U.S.S.G. §2D1.1(c)(7), and particularly the Drug Equivalency Table it references, are just the sort of guidelines promulgated without the Commission's exercise of its characteristic role. Thus, the guideline is due less respect from the sentencing court.[12]

---

[8] See United States v. Ellis, 641 F.3d 411, 421-22 (9th Cir. 2011).
[9] See Carty, 520 F.3d at 991, 993-94.
[10] Krimbrough v. United States, 552 U.S. 85, 109-11, 128 S.Ct. 558, 575-76, 169 L.Ed.2d 481 (2007).
[11] Rita v. United States, 551 U.S. 338, 353, 127 S.Ct. 2456, 2466, 168 L.Ed.2d 203 (2007).
[12] See Kimbrough, 552 U.S. at 109-11, 128 S.Ct. at 575-76.

A downward variance based on substantive disagreements with the Guidelines is particularly appropriate in oxycodone cases. Amendments to the Guidelines substantially increased the penalty for trafficking certain forms of oxycodone while leaving nearly-identical and more-dangerous drugs untouched. In passing this amendment, the Commission was not acting in "the exercise of its characteristic institutional role" as required by Kimbrough. In its revision of oxycodone policy, the Commission acted in an arbitrary fashion and ignored vital sentencing considerations. The result has been increased sentence disparities and excessive penalties relative to the social harm. The Commission's attempt to fix a generalized flaw in the drug equivalency tables had the practical effect of penalizing oxycodone up to 6.7 times more harshly than heroin, which is a far more dangerous drug, and up to 13.4 times more severely than morphine, which is essentially equivalent to oxycodone. The resulting policy is unjust and should be discarded by this Court. Indeed, while Kimbrough concerned crack cocaine and this case involves oxycodone, the only difference is the name of the controlled substance; the arbitrary frailty of the Sentencing Guidelines is the same.[13]

When the Guidelines were developed in 1987, the Commission set oxycodone as an equivalent to heroin and utilized the drug-equivalency analysis because the drug was not specifically addressed in 21 U.S.C. §841(b)(1). In doing so, they consulted "numerous experts and practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized

_____

[13] See Kimbrough, 552 U.S. at 109-11, 128 S.Ct. at 575-76.

Case 3:10-cr-00108-RRB    Document 81    Filed 01/20/12    Page 8 of 23

Crime Drug Enforcement Task Forces, who also advocate the necessity of these distinctions."[14]

As a result of that study, the original drug equivalency table submitted to Congress gave Oxycodone a slightly higher conversion than morphine; "1 gm of Oxycodone = 1 gm of heroin" and "1 gm Morphine = 0.5 gm heroin."[15]  Before the guideline became effective, however, the Commission reduced the oxycodone ratio to match the morphine ratio of 0.5 gm of heroin.  This ratio made sense given the two drugs similarities and it remained in place (although the baseline equivalency was changed to marijuana) until 2003.

In Mingarelli's case, this ratio of 1 gm of oxycodone to 0.5 gm of heroin would result in a far lesser advisory sentencing range.  Mingarelli's total of 132.54 grams of oxycodone[16] would equate to 66.27 grams of heroin.  66.27 grams of heroin would place this offense squarely in Base Offense Level 22 (at least 60 but less than 80 grams of heroin).[17]  In contrast, the PSR, utilizing the arbitrary equating of oxycodone to 6700 grams of marijuana creates a Base Offense Level of 32.[18]

---

[14] 52 Fed. Reg. 18046.

[15] 52 Fed. Reg. 18046.

[16] See Discussion as to PSR Points 20-27, supra.  The PSR figure of 174.16 grams is multiplied by .7610 (the ratio between $107,716.36 and $141,541.65) to arrive at 132.54 grams.

[17] As discussed in relation to Mingarelli's disagreement with PSR Point 27, supra, the Base Offense Level of 22 is likewise indicated by utilizing the same methodology with a marijuana equivalent in the Drug Equivalency Tables.  Moreover, as set forth in footnote 1, supra, when the entire $141,541.65 is utilized, the Base Offense Level is only 24 -- versus the 32 utilized in the PSR.

[18] See PSR Point 27.

In 2003, Amendment 657 to the Federal Sentencing Guidelines changed the drug equivalency conversion from "1 gm of Oxycodone = 500 gm of marihuana" to "1 gm of Oxycodone (actual) = 6700 gm of marihuana." The term "Oxycodone (actual)" was defined as "the weight of the controlled substance, itself, contained in the pill, capsule, or mixture." The Commission explained that the amendment addressed proportionality issues: "(1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight." These differences in proportionality had created more severe sentences for trafficking Percoset pills (which contain 5 mg of oxycodone, but weigh 550 mg) than for trafficking low dose OxyContin pills (which contain 10 mg of oxycodone, but weigh 135 mg). The Commission's "solution" for this discrepancy was to penalize the weight of the component substance itself and drastically increase oxycodone's equivalency ratio. They explained that the new equivalency would keep the same penalties for 10 mg OxyContin pills, but would substantially increase the penalties for all other doses and would decrease somewhat the penalties for Percoset offenses.

There are several flaws with this amendment and the current oxycodone sentencing policy. First, the equivalencies for morphine and codeine, drugs which are nearly identical to oxycodone, were not changed. Like oxycodone, morphine and codeine are Schedule II opioid analgesics with very similar chemical structure and clinical use. It is arbitrary on its face to punish offenses involving morphine based on the

weight of the mixture while punishing oxycodone by actual weight of the controlled substance when the drugs are medically equivalent.[19]

Morphine, like oxycodone, is available in pill form with varying actual drug weights and is similarly vulnerable to sentencing discrepancies based on trafficking in low-dose versus high-dose pills. As a practical matter, a defendant convicted of trafficking high dose MS Contin pills (which contain 100 mg of morphine and weigh 285 mg) would be given a significantly lighter sentence than a defendant who trafficked an equivalent number of 30 mg OxyContin pills. Such dramatic sentencing disparity between essentially identical drugs is unwarranted and unjust.

Second, the Commission's decision to set one gram oxycodone (actual) as equivalent to 6700 grams marijuana is not reasonable. The new ratio was intended to increase the penalties for all doses of OxyContin except the lowest available, the 10 mg tablets. The Commission gave no criteria for why 10 mg OxyContin pills should be the new benchmark. Nor did they provide any evidence that higher doses are more dangerous or likely to be abused. Lacking such findings, this court should question the appropriateness of this equivalency, particularly since no other opiate equivalencies were changed. It bears emphasis that a visible consequence of the new equivalency is that oxycodone is now punished 6.7 times more severely than pure heroin and up to 13.4 times more severely than morphine.

---

[19] See AMDG, Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain. 2010 Update, p 17, available at http://www.agencymeddirectors.wa.gov/guidelines.asp.

This treatment reflects an unsound judgment as to the relative danger of oxycodone abuse. The Commission voted for substantially-increased penalties for oxycodone in hopes of deterring further increases in its abuse. However, they did not conduct a study or otherwise engage in appropriate fact finding to conclude that the significant increased were rationally proportional to the harm caused.

Additionally, the penalties are higher than heroin even though there is little significant difference between oxycodone and heroin, except that oxycodone is less dangerous. Heroin is a Schedule I drug with no approved medical use. The National Institute on Drug Abuse (NIDA) has reported that heroin is the most abused and the most rapidly acting of the opiates.[20] Heroin also poses a greater social danger than oxycodone, which is a pharmaceutically-produced and controlled substance. Because oxycodone is not as significant of a threat to public health as heroin, it should not be penalized so much more severely in sentencing. Indeed, it should not be penalized more severely than the most analagous Schedule 2 opioid analgesic: morphine. Certainly the tail is wagging the dog when a less dangerous form of a highly abused drug has a higher penalty.

Moreover, the Sentencing Commission recently surveyed district judges, asking whether they found the guideline ranges were generally appropriated for several types of offenses. For oxycodone, 29% of the responding judges found the guidelines "too high."[21] About the same number found the heroin guideline too high, notwithstanding

---

[20] NIDA Research Report, Heroin: Abuse and Addiction, Revised 2005, available at http://www.drugabuse.gov/ResearchReports/Heroin/Heroin/Heroin.html.
[21] U.S.S.C. Results Survey of United States District Judges: January 2010 through March 2010, Table 8.

how much lower it is than oxycodone.[22]  Statistics by NIDA and the Commission itself confirm that the Commission was not exercising sound, reasoned sentencing judgment when enhancing the oxycodone penalties.  Their explanation for Amendment 657 dealt exclusively with the attempt to address a drug proportionality problem.  The oxycodone guideline does not deserve judicial deference in following Congress's directive that sentences be sufficient, but not greater than necessary to satisfy the goals of sentencing.

Again, if Mingarelli's 132.54 grams of oxycodone are treated like morphine, as is appropriate given what we know about oxycodone, and as it was treated originally under the Guidelines, his advisory Guidelines range would be 46-57 months.

2.     **Downward Departures Under The Sentencing Guidelines Based Upon Post-Offense Rehabilitation And Family Ties And Responsibilities**

Prior to Gall,[23] Ninth Circuit case law recognized that post-offense rehabilitation provides the basis for a downward departure under the Sentencing Guidelines where the rehabilitation is extraordinary or atypical.[24]  Likewise, pre-Gall, Ninth Circuit case law recognized that extraordinary family circumstances provide the basis for a downward departure.[25]  With the advent of Gall, the "extraordinary circumstances" requirement has been expressly rejected.[26]  Nonetheless, Damien Mingarelli does demonstrate extraordinary circumstances in both regards -- as to post-offense rehabilitation and as to family ties and responsibilities.

---

[22] Id.
[23] Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)
[24] See United States v. Tzoc-Sierra, 387 F.3d 978, 981 (9th Cir. 2004).
[25] See United States v. Menyweather, 447 F.3d 625, 632-34 (9th Cir. 2006).

One case akin to Mingarelli's on post-offense rehabilitation is <u>United States v.</u> <u>Clay</u>, 483 F.3d 739 (11th Cir. 2007). At trial, Clay was convicted of possessing pseudoephedrine with reasonable cause to believe it would be used to manufacture methamphetamine (meth), and at sentencing the Court found by a preponderance of the evidence that Clay was responsible for the manufacture of at least 1.5 kilograms of meth and that Clay possessed a firearm during the offense.[27] The Sentencing Guidelines imprisonment range for Clay was 188 to 235 months.[28]

At the sentencing, the Court found that Clay's post-offense rehabilitation was extraordinary because Clay had made real changes in his life, most particularly by not only overcoming his own meth addiction but also by inspiring others to overcome their addictions through his example.[29] As in Mingarelli's case, Clay changed his life around after arrest on State charges but before indictment on federal charges.[30] "That the changes in Clay's life occurred before Clay had any inkling that he would face a prison sentence further evidences that the measure of his rehabilitation was extraordinary."[31]

Based upon Clay's post-offense rehabilitation, the Court sentenced him to a 60-month sentence, slightly less than one-third of the low end of the Sentencing Guidelines

---

[26] <u>See</u> <u>Gall</u>, 552 U.S. at 47, 128 S.Ct. at 595; <u>United States v. Ruff</u>, 535 F.3d 999, 1002 (9th Cir. 2008).
[27] <u>See</u> <u>United States v. Clay</u>, 483 F.3d 739, 741-42 (11th Cir. 2007).
[28] <u>Id</u>. at 742.
[29] <u>See</u> <u>Clay</u>, 483 F.3d at 742, 746.
[30] <u>See</u> <u>id</u>. at 746.
[31] <u>Id</u>.

range.[32]  On appeal, Clay's sentence was affirmed based upon his extraordinary post-offense rehabilitation.[33]

As to departures based upon family ties and responsibilities, in <u>Menyweather</u> the Court was presented with a Sentencing Guidelines range of 21 to 27 months.[34]  Based upon the defendant's family circumstances and mental and emotional condition, the Court departed downward 8 levels, resulting in a sentencing range of zero to 6 months.[35]  In so ruling, the Court did not rely on any post-conviction rehabilitation.[36]

On appeal, Menyweather's sentence was affirmed.[37]  In so holding, the <u>Menyweather</u> Court observed that District Courts are particularly suited from their personal vantage points to make the determination of when a defendant's family ties and responsibilities are unusual so as to warrant a departure based thereon.[38]  The Court added that since a six-level downward departure for extraordinary family circumstances alone has been recognized as reasonable, an eight-level downward departure based upon the combined effect of family circumstances and another departure factor was not unreasonable.[39]

In Mingarelli's case, his family ties and responsibilities fall within the extraordinary.  Mingarelli is the head of a family whose presence is absolutely necessary,

---

[32] <u>Id</u>. at 742-43.
[33] <u>See</u> <u>id</u>. at 744-47.
[34] <u>See</u> <u>Menyweather</u>, 447 F.3d at 628.
[35] <u>Id</u>.
[36] <u>Id</u>. at 629.
[37] <u>See</u> <u>id</u>. at 631-36.
[38] <u>See</u> <u>id</u>. at 633.
[39] <u>See</u> <u>id</u>. at 635-36.

Case 3:10-cr-00168-RRB   Document 81   Filed 01/20/12   Page 15 of 23

in many respects -- including providing the proper upbringing for Ariana Mingarelli, his eight-year-old daughter from a previous marriage, and providing for the proper upbringing of his six-month-old daughter Chloe Mingarelli -- both as an essential parent and role model and as the bread winner whose presence is critical for the economic survival of the family.

When Mingarelli's situation is compared to those in <u>Clay</u> and <u>Menyweather</u>, downward departures of at least an equivalent amount are warranted. If, as in <u>Clay</u>, the Court were to depart to slightly less than one-third of the lower level of the Sentencing Guidelines range of 46 to 57 months, the Guidelines sentence would be 15 months. In view of the additional basis for a downward departure based upon Mingarelli's family ties and responsibilities, a downward departure to slightly less than one-sixth of the lower level of the Sentencing Guidelines range is warranted, resulting in a Guidelines sentence of 7 months.

> **B.    <u>The Appropriate Sentence In Damien Mingarelli's Case In View Of The Factors Under 18 U.S.C. §3553(a)</u>**

In the wake of <u>Gall</u>, the Ninth Circuit has affirmed at least four cases where a several-year imprisonment under the Sentencing Guidelines was reduced by the District Court to essentially a probationary sentence. First, in <u>Whitehead</u>,[40] where the defendant had sold over $1 million in counterfeit digital-satellite-feed access cards, the Court affirmed a sentence of five years of supervised release in view of the defendant's repentance and his family situation, even though the Sentencing Guidelines imprisonment

range was 41 to 51 months.[41] While Judge Bybee dissented in Whitehead, his dissent was grounded on the fact that there was nothing remarkable in Whitehead's family situation and Whitehead did not demonstrate any remorse or make any life changes until after he was indicted and faced the federal ax.[42]

Subsequently, in Ruff, where the defendant was convicted of health-care fraud, embezzlement, and money laundering in relation to stealing over $600,000.00 in supplies from a non-profit hospital, the Court affirmed a sentence of one day of imprisonment and three years of supervised release, with the condition that the defendant serve 12 months and one day of supervised release at a corrections center, even though the Sentencing Guidelines imprisonment range was 30 to 37 months.[43] Like Judge Bybee in Whitehead, Judge Gould dissented in Ruff. Judge Gould's dissent was anchored in the fact that two key factors in Gall -- post-crime maturation and self-rehabilitation -- were not present in Ruff's case.[44]

In United States v. Autery, 555 F.3d 864 (9th Cir. 2009), the defendant was convicted of possession of child pornography and the Guidelines range was a sentence of between 41 and 51 months of incarceration.[45] The District Court then deviated from the Guidelines and sentenced the defendant to no period of incarceration and five years of probation with very specific and special conditions so as to closely monitor the defendant

---

[40] United States v. Whitehead, 532 F.3d 991 (9th Cir. 2008), rehearing and rehearing en banc denied, 559 F.3d 918 (9th Cir. 2009).
[41] See Whitehead, 532 F.2d at 992-93.
[42] See id. at 997-98 (Bybee, J., dissenting).
[43] See Ruff, 535 F.3d at 1001-04.
[44] See Ruff, 535 F.3d at 1005-06 (Gould, J., dissenting).

and check any tendency to reoffend.[46]  On appeal, the Court reviewed the District Court's thorough consideration of the sentencing factors under 18 U.S.C. §3553(a) -- including the defendant's high likelihood of becoming a non-threatening and productive member of society and the defendant's overall dissimilarly with others convicted of the same offense -- and affirmed the sentence.[47]

More recently, in United States v. Edwards, 595 F.3d 1004 (9th Cir. 2010), the defendant was convicted of bankruptcy fraud and making a false statement to a bank.[48] Although the Sentencing Guidelines range was 27 to 33 months of incarceration, the defendant was sentenced to five years of probation, including seven-months of house arrest, a $5000.00 fine, and restitution in the amount of $102,696.07.[49]  The District Court recognized that Edwards had previously committed serious crimes in two other States, but focused on Edwards' demeanor and mannerisms during allocution and then observed that Edwards had genuinely changed and posed no chance of reoffending.[50]  In addition, the District Court considered and explained why Edwards' case was different from other such cases and why a disparity in Edwards' favor was well warranted.[51]  In view of the District

---

[45] See States v. Autery, 555 F.3d 864, 867 (9th Cir. 2009).
[46] See id. at 867-68.
[47] See Autery, 555 F.3d at 873-78.
[48] See United States v. Edwards, 595 F.3d 1004, 1008 (9th Cir. 2010), rehearing en banc denied, 622 F.3d 1215 (9th Cir. 2010).
[49] See Edwards, 595 F.3d at 1008.
[50] See id. at 1015, 1017.
[51] See id. at 1017-18.

Court's thorough consideration of the sentencing factors and reasoned basis for decision, the Ninth Circuit affirmed the probationary sentence.[52]

Other Courts of Appeal have affirmed similar sentences. For example, in United States v. Thurston, 544 F.3d 22 (1st Cir. 2008), after remand from the United States Supreme Court for reconsideration in light of Gall, the Court of Appeals affirmed a sentence of three months incarceration with 24 months of supervised release for conspiring to defraud Medicare of over $5,000,000.00, where the Sentencing Guidelines imprisonment range was 63 to 78 months and the defendant did not demonstrate any extraordinary circumstances.

In United States v. McManus, 262 Fed. Appx. 732 (8th Cir. 2008), the Court affirmed, in light of Gall, the District Court's decision to impose a sentence of 24 months imprisonment in a methamphetamine case where the Sentencing Guidelines imprisonment range was 57 to 71 months and the defendant demonstrated no extraordinary circumstances.

Similarly, after remand from the United States Supreme Court for reconsideration in light of Gall, the Court of Appeals in United States v. MacDonald, 267 Fed. Appx. 477 (8th Cir. 2008) affirmed the District Court's sentence of 132 months for several methamphetamine charges where the Sentencing Guidelines imprisonment range was 262 to 327 months and the defendant did not demonstrate any extraordinary circumstances, and indeed, did not demonstrate any rehabilitation at all.

---

[52] See id. at 1018.

Perhaps the case closest to Mingarelli's is <u>Gall</u> itself. In <u>Gall</u>, the Supreme Court reversed the Court of Appeals and thus affirmed the District Court's sentence of 36 months of probation for conspiracy to distribute the drug "ecstasy" (a member of the methamphetamine family), where the Sentencing Guidelines imprisonment range was 30-37 months, but Gall had voluntarily withdrawn from the conspiracy and had stopped using illegal drugs and had otherwise rehabilitated himself in three-and-a-half years from his withdrawal to his indictment, after which he started his own construction-industry business, principally subcontracting for window and door installation while on release in his case.[53] In so holding, the Court emphasized the timing of the rehabilitation:

> Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here had greater justification for believing Gall's turnaround was genuine, as distinct from a transparent attempt to build a mitigation case.[54]

The <u>Gall</u> Court also observed that even if Gall had not demonstrated unusual rehabilitation, the probationary sentence would have been nonetheless appropriate if there were instead "compelling family circumstances."[55] The Supreme Court then added that "Gall's self-motivated rehabilitation" was a significant factor, to which the "District Court quite reasonably attached great weight" and which "also lends strong support to the

---

[53] <u>See</u> <u>Gall</u>, 552 U.S. at 40-45, 55-59, 128 S.Ct. at 591-93, 600-02.

[54] <u>Id.</u>, 552 U.S. at 57, 128 S.Ct. at 600-01.

[55] <u>Id.</u>, 552 U.S. at 59, 128 S.Ct. at 602 (quotation and citation omitted); <u>cf.</u> <u>Menyweather</u>, 447 F.3d at 632-34 (affirming on the additional basis that even if a Sentencing Guidelines departure were not warranted because the defendant's family circumstances were not exceptional, the "broader appraisal" available after <u>Booker</u> justified the District Court's consideration of and reliance on family responsibilities under the multi-faceted, big-picture sentencing scheme embodied in 18 USC §3553(a)) (quotation and citation omitted).

conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts."[56]

To summarize the factors under 18 U.S.C. §3553(a), the PSR at Point 101 acknowledges that a sentence below the Guidelines range is warranted under §3553(a)(1):

> The conspiracy that the defendant was involved in was relatively short-lived. Additionally, at the time of the offense, the defendant was abusing oxycodone.

In addition, as discussed previously, Mingarelli's history and characteristics further support a sentence below the Guidelines range pursuant to 18 U.S.C. §3553(a)(1).

The PSR at Point 101 also acknowledges that a sentence below the Guidelines range is warranted under 18 U.S.C. §3553(a)(2):

> A sentence within the guideline range may not be necessary to afford adequate deference to criminal conduct or protect the public from further crimes of the defendant.

Mingarelli is in complete agreement. As the evidence indicates, he ceased all involvement with drugs and became a changed man before charges were brought.[57] Indeed, he has continued on this course with his marriage to Summer Peppler in November of 2010 and the birth of their daughter Chloe on June 30, 2011.[58] As indicated in the accompanying letters in support of Mingarelli, those who know him -- family, friends, and employers alike -- speak highly of him as a gifted individual and have legitimately-great expectations for his future.

---

[56] Gall, 552 U.S. at 59, 128 S.Ct. at 602.
[57] See PSR Point 69.
[58] See PSR Point 66.

As to 18 U.S.C. §3553(a)(3), (a)(4), and (a)(5) -- the kinds of sentences available, the application of the Sentencing Guidelines, and any applicable policy statements by the Sentencing Commission, Mingarelli has discussed those aspects thoroughly above. In short, this is a case where a probationary sentence is available and where the Sentencing Guidelines and corresponding policies for departures and other variances counsel and even command such a sentence.

As to 18 U.S.C. §3553(a)(6) and its goal of avoiding unwarranted sentencing disparities, Mingarelli is not the typical offender and this is not the typical oxycodone case. Other persons who were involved in this matter and who have been sentenced previously have received light sentences. In view of the circumstances of the case, coupled with Mingarelli's concrete, positive changes, the Court is entirely justified in sentencing Mingarelli to a probationary sentence and should do so.

## III.   CONCLUSION

In conclusion, in view of the evidence presented, Damien Mingarelli respectfully requests that the Court sentence him to a probationary sentence, one that will allow Mingarelli to continue the fruitful family and professional life he has cultivated for the past two years. The fact of Mingarelli's voluntary withdrawal from the conspiracy and the circumstances of Mingarelli's life and family distinguish him "from the vast majority of defendants convicted of conspiracy in federal court"[59] and are "sufficiently compelling to support the degree of the variance."[60]

---

[59] Gall, 552 U.S. at 56-57, 128 S.Ct. at 600.
[60] Id., 552 U.S. at 50, 128 S.Ct. at 597.

DATED at Fairbanks, Alaska this 20th day of January, 2012.

LAW OFFICE OF ROBERT JOHN
Attorney for Damien Mingarelli

By: /s/ Robert John
    Robert John
    Alaska Bar No. 8911069
    P.O. Box 73570
    Fairbanks, Alaska 99707
    907-456-6056

Certificate of Service
I hereby certify that on January 20, 2012,
I electronically filed the foregoing with
the Clerk of the Court for the United States
District Court for the District of Alaska by
using the CM/ECF system.

I certify that all participants in the case are
registered CM/ECF users and that service
will be accomplished by the CM/ECF system.

Law Office of Robert John
By: s/Robert John