UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:10-cr-00108-01-RRB |
| | ) | |
| Plaintiff, | ) | Fairbanks, Alaska |
| | ) | Friday, February 24, 2012 |
| vs. | ) | 1:17 o'clock p.m. |
| | ) | |
| DAMIEN MINGARELLI, | ) | **IMPOSITION OF SENTENCE** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              JOSEPH BOTTINI, ESQ.
                                U.S. Attorney's Office
                                222 West 7th Avenue, #9
                                Anchorage, Alaska    99513-7567
                                (907) 271-5071

For the Defendant:             ROBERT JOHN, ESQ.
                                Law Office of Robert John
                                P.O. Box 73570
                                Fairbanks, Alaska    99707
                                (907) 456-6056

Probation Officer:             MATT JEDROSKO
                                U.S. Pretrial Service/Probation
                                  Office
                                222 West 7th Avenue, #48
                                Anchorage, Alaska    99513
                                (907) 271-5492

Court Recorder:                JODY EVANS
                                U.S. District Court
                                101 12th Avenue, Room 332
                                Fairbanks, Alaska    99701
                                (907) 451-5792

▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰
**NoDak Rose Transcripts**
*721 North 19th Street*
*Bismarck, North Dakota 58501-1721*
*(701) 255-1054 ❧ nodak@btinet.net*

```
 1   Transcription Service:        NODAK ROSE TRANSCRIPTS
                                   721 North 19th Street
 2                                 Bismarck, North Dakota  58501
                                   (701) 255-1054
 3
     Proceedings recorded by electronic sound recording.
 4   Transcript produced by transcription service.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    FAIRBANKS, ALASKA - FRIDAY, FEBRUARY 24, 2012

2        (Call to Order of the Court at 1:17 p.m.)

3        (All parties present; defendant present)

4        THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is now

6    in session, the Honorable Ralph R. Beistline presiding.

7    Please be seated.

8        THE COURT:  All right.  We're on the record.  United

9    States of America v. Mingarelli.  It's Case 3-10-108.  This is

10   the time set for sentencing.  My notes reflect that it was

11   April 1st, 2011, that the defendant pled guilty to count one

12   of the Indictment, conspiracy to launder proceeds of unlawful

13   distribution of controlled substances.  A presentence report

14   was prepared which I have reviewed.  Any changes or additions

15   to the presentence report?

16       MR. JOHN:  None other than we -- we made

17   (indiscernible - simultaneous speakers).

18       THE COURT:  Other than what's previously been

19   addressed?

20       MR. JOHN:  Yes, yes.

21       THE COURT:  All right.  Mr. Mingarelli, have you

22   taken a look at it?  Have you seen it?

23       THE DEFENDANT:  Uh --

24       THE COURT:  The presentence report, this --

25       THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  Any changes or additions from your

2    standpoint beyond what your attorney --

3        THE DEFENDANT:  No, Your Honor.

4        THE COURT:  Okay.  The Court will accept the

5    presentence report and the factual statements that are

6    contained in it, having been established by a preponderance of

7    the reasonably reliable information, and we'll proceed to

8    sentencing based thereon.

9        It looks initially we have an offense level of

10   thirty-five, a criminal history category of three, which

11   provides a guideline sentencing range of two hundred and ten

12   to two hundred forty months.

13       I've read the letters that have come in from the

14   family and friends of the defendant.  Does the Government have

15   any witnesses today or anything of that nature?

16       MR. BOTTINI:  We do not, Your Honor.  Thank you.

17       THE COURT:  Mr. John any wit -- any additional

18   witnesses today?

19       MR. JOHN:  No, Your Honor.

20       THE COURT:  Okay.  Okay.  Well, then I guess we're

21   ready to proceed.  We'll hear from the Government with regard

22   to your recommendation.  Do we have the probation officer on

23   the phone?

24       THE PROBATION OFFICER:  Yes, Your Honor.  I'm on the

25   phone.

1    THE COURT:  Okay.

2    THE PROBATION OFFICER:  This is Matt Jedrosko.

3    THE COURT:  Okay.  All right.  Very well.

4    **GOVERNMENT'S SENTENCING RECOMMENDATIONS**

5    MR. BOTTINI:  Thank you, Your Honor.  As -- as you

6    know from our memorandum, we basically adopted the

7    recommendation which the probation office had made as to Mr.

8    Mingarelli; that is, a sentence of ninety-six months.  It's

9    certainly warranted in this case.

10   Mr. Mingarelli was responsible for providing a very

11   significant amount of prescription medication, oxycodone

12   pills, which were distributed unlawfully in the Fairbanks

13   area.  And in return, he received, in a relatively short

14   window of time, approximately a hundred and forty-six thousand

15   dollars back to him or others on his behalf.

16   Now, I know there is a dispute as to one of those

17   individuals because -- for Norman (ph).  Mr. Mingarelli

18   apparently now contends that that person was not receiving

19   funds on his behalf.  That is different from what he told the

20   agents when he was interviewed.  He acknowledged that that

21   person in fact was receiving money back on his behalf.  So,

22   the figure that is in the presentence report is absolutely

23   accurate in the Government's view, reflecting what Mr.

24   Mingarelli got back through him.

25   Now, of course, there's a couple of different ways

1    to calculate the offense level in a money laundering case like

2    this.  In this case, the method that was used by the probation

3    office is absolutely valid.  It was relatively easy to

4    determine, based upon the results of the investigation, how

5    many dosage units Mr. Mingarelli was responsible for in

6    sending to Fairbanks, and with the conversion to the -- the

7    drug table to kilograms of marijuana, you know, he comes out

8    at level thirty-one, I believe -- or thirty-two, excuse me.

9         The adjustment for role in the offense is absolutely

10   accurate and valid in this case.  Mr. Mingarelli was at the

11   top of the pyramid of these individuals who were involved in

12   receiving the pills, selling them, and sending him back the

13   money.  So, there's no question that he is an organizer/leader

14   as defined by the sentencing guidelines, and that a four-level

15   adjustment is warranted.

16        Now, taking all of that into consideration and --

17   and -- and taking the §3553 factors into consideration, we

18   feel that a sentence of ninety-six months is adequate in this

19   case and it does adequately address his conduct.

20        So, in summary, a sentence of ninety-six months to

21   serve is, in the Government's view, the appropriate sentence

22   in this case.

23        THE COURT:  Okay.  But that's considerably less than

24   the guideline range.

25        MR. BOTTINI:  It's considerably less than the

1  guideline range.

2            THE COURT:  But you're --

3            MR. BOTTINI:  The guideline range in this case came

4  out -- it would have doubled that amount, almost tripled that

5  amount.  So -- and we do recognize that that is a significant

6  discount from where the sentencing guidelines came out for Mr.

7  Mingarelli.

8            THE COURT:  So, you're -- you're advocating a

9  variance then.

10           MR. BOTTINI:  Yes, all things considered, and, you

11 know, I -- in making our recommendation, we also took into

12 account the methodology that had been used to compute the

13 offense level for the first two defendants of this conspiracy,

14 Mr. Stanford and Mr. Dueze (ph), their conduct as well.  And

15 so I -- there -- you know, a lot of things went on to the --

16 to the scales to balance here as far as determining what --

17 what ought to be an appropriate sentence in this case, but,

18 yes, basically a recommendation of ninety-six months is a -- a

19 -- a whopping discount from where the sentencing guidelines

20 come out.

21           THE COURT:  Okay.  All right.  Mr. John?

22           MR. JOHN:  Yes, Your Honor.  May it please the

23 Court.  If I could speak over here.

24           THE COURT:  Sure.  That would be fine.

25           **DEFENDANT'S SENTENCING RECOMMENDATIONS**

1        MR. JOHN:  May it please the Court.  I've been

2   before Your Honor numerous times in numerous courts over the

3   last couple of decades, and I find this to be a very difficult

4   and troubling case because we have some serious charges here,

5   most certainly, but I also have -- of the many defendants I've

6   represented over my life, one of the persons with the most

7   potential and really in an incredibly good situation in their

8   life at present.

9        So, we have questions both about the law here and

10  about the individual who's appearing before the Court, and

11  before going back to Mr. Mingarelli himself, I'd like to just

12  discuss the legal issues that we have here.

13       There's evidence about -- about what this -- this

14  pattern of -- of sales and money and the like was, and Mr.

15  Mingarelli has never really disputed the situation in general,

16  it's just that to really look at it realistically, is this is

17  just simply a method of payment.  If Mr. Mingarelli in this

18  case had simply received cash at the time of doing this

19  transaction, he probably never would have been prosecuted for

20  anything.  But this was just a situation -- there was no

21  organization, he wasn't the head of anything, he was selling

22  to people and like in any transaction in the drug world, one

23  gets paid one way or another, and Mr. Mingarelli was getting

24  paid through transactions.  He has not disputed the vast

25  quantity of them, but he does in fact dispute a certain

1    percentage of them.

2            Now, we look at the point here -- even if --

3    regardless of whether we look at the whole hundred and forty-

4    some thousand or we -- we look at the hundred thousand or so

5    that Mr. Mingarelli acknowledges were proceeds that he

6    received, one of the real problematic issues in this case is

7    -- is the sentencing guidelines.  The Court here is sentencing

8    Mr. Mingarelli the man, not Mr. Mingarelli the matrix, and

9    this is a case where the sentencing guidelines' matrix is way

10   out of whack and very unfair, and I discussed that -- and that

11   really has to do with the calculation and the changes that

12   were made for oxycodone.

13           Now, if Mr. Mingarelli, instead of distributing the

14   amount of oxycodone that this calculates out to, had gone to

15   Afghanistan to the opium fields, come back with the purest of

16   heroin -- the same amount, the same weight -- and distributed

17   that, he would be looking at a sentence, as I calculated it,

18   in the forty-six to fifty-seven-month period on the lower

19   amount of -- of the money and only a little bit more than that

20   on the four hundred and forty thousand dollars.

21           So, because of the disparity, thirteen point four

22   [13.4] times increase from what the sentencing guidelines were

23   before to what they were now, that's why this sentence is so

24   outrageous and so high.

25           THE COURT:  So, I -- you kind of lost me there.  Why

1    -- you say there were thirteen -- I didn't follow that.

2            MR. JOHN:  Under the sentencing guidelines prior to

3    2003 --

4            THE COURT:  Okay.  The old sentencing guidelines.

5            MR. JOHN:  Yes.  Treated --

6            THE COURT:  But we're dealing with the current

7    sentencing guidelines.

8            MR. JOHN:  Right.  But that's one of the disparities

9    of the sentencing guidelines that the Court should look into;

10   that's an arbitrary change by the Sentencing Guidelines

11   Commission.  And what I'm saying is if Mr. Mingarelli was a

12   heroin distributor who'd gone to the fields of Afghanistan and

13   came back with an -- the same amount of heroin as he had of

14   oxycodone, he'd be looking at a sentence of like four, five,

15   or six years as the starting point under the guidelines, and

16   it's only because of this increase that's very arbitrary for

17   oxycodone -- thirteen point four [13.4] times morphine, six

18   point seven [6.7] times heroin -- that Mr. Mingarelli's even

19   starting with -- with this high level of a sentence in the

20   first place.

21           So, our position is that -- that the starting point

22   before making variances, which we agree with the Government

23   are appropriate, should be in the forty-six to fifty-seven-

24   month range instead of -- of the level when you use oxycodone

25   as thirteen point four [13.4] times methadone.  Now --

1          THE COURT: Okay. I'm just -- that's interesting.

2  Did the probation officer hear -- can you hear all this?

3          THE PROBATION OFFICER: Yes, Your Honor.

4          THE COURT: Are you following it?

5          THE PROBATION OFFICER: Yes, Your Honor. Defense

6  comes (indiscernible) objections --

7          THE COURT: Right.

8          THE PROBATION OFFICER: -- there was the change

9  (indiscernible - simultaneous speakers).

10          THE COURT: And you responded in the objections,

11  didn't you?

12          THE PROBATION OFFICER: Yes.

13          THE COURT: Okay. All right. I just want to make

14  sure everybody's hearing. Go ahead.

15          MR. JOHN: Yeah. And I believe that -- that's one

16  thing why this case -- that's one of the real problems in this

17  case from that perspective. Now -- and the questions about,

18  well, what was Mr. Mingarelli? He's really just someone who

19  was a drug dealer and who got paid. That's it.

20          THE COURT: So, I'm just -- I'm really -- I -- I

21  want -- I -- I hate to keep interrupting you, but I'm -- you

22  know, so you have a -- therefore, your point on appeal, if the

23  Court sentenced consistent with the guidelines -- and the

24  argument would be that the method for sentencing oxycodone is

25  arbitrary and inappropriate or --

1    MR. JOHN:  Arbitrary and inappropriate, it's a

2  denial of equal protection, it's the -- it's similar to the

3  Kimbro case where they talked about the crack cocaine

4  disparity.

5    THE COURT:  Oh, you're challenging the guidelines.

6  You're challenging the method of deter -- of dealing with

7  oxycodone under the guidelines.

8    MR. JOHN:  Well, that's one of our objections --

9    THE COURT:  Yeah.

10    MR. JOHN:  -- to -- the the use of the guidelines in

11  this case, Your Honor.  And the court under Kimbro --

12    THE COURT:  They are -- they're advisory.

13    MR. JOHN:  Right, right.  And -- and Kimbro

14  recognizes the Court's ability to -- to in such a case -- the

15  same thing with crack co -- crack cocaine; a hundred to one,

16  thirteen point four [13.4] to one.  It's -- it's really -- it

17  -- it's what jacks the sentence up into the range that it is,

18  and -- and absent that jack-up, Mr. Mingarelli is much more in

19  the range of the other persons who -- who participated in this

20  case.

21    THE COURT:  Okay.

22    MR. JOHN:  Now, let -- let's look at Mr. Mingarelli,

23  the man here, and -- and the Government made -- made a

24  statement there at page five of its -- its sentencing

25  memorandum.  It said mis -- Mingarelli had so many prior

1  brushes with the law and still didn't get it before he engaged

2  in this offense.  Now, that may be correct, but the thing is

3  Mr. Mingarelli did get it after he engaged in this offense and

4  before he was apprehended, and I believe that's a significant

5  question right here.

6       It's not a question where Mr. Mingarelli has had a

7  change of heart for sentencing purposes, he, like the

8  defendant in Gall (ph) before the United States, was someone

9  that's -- you know, better late than never, but it sunk in

10  with him.  He realized, you know, this isn't right.  But at

11  that point in time, of course, there's nothing he could do to

12  change what he did in the past, he could only proceed on the

13  path of redemption, which (indiscernible) to make his life

14  better for the future.

15       At the point the government agents came upon Mr.

16  Mingarelli in this case and interrogated him, he had

17  established a normal life in Las Vegas, he had a girlfriend

18  who later became his wife, he had a young child already and

19  now they've had a child of their own, and he, you know, didn't

20  quite have the same row of success as the defendant in Gall

21  had during the period, but nevertheless, Mr. Mingarelli was on

22  that same path of redemption.

23       He had changed his ways prior to that, and that's a

24  really big consideration because one of the issues is what do

25  I need to sentence Mingarelli to, to make sure he doesn't re-

1    offend.  Well, as the sentencing report recognizes, there's

2    very little, if any, threat of Mr. Mingarelli re-offending in

3    this type of situation.

4          Now, he's had various problems here and maybe part

5    -- (indiscernible) it's like there's a cloud hanging over his

6    head.  He had an auto accident, then another auto accident,

7    and these things exist out there, and Mr. Mingarelli really

8    wanted to be sentenced before.  This has been very stressful

9    to him, the uncertainty of this with the life he has, and he's

10   right now in a position -- you know, I think, boy, to be

11   twenty-seven years old with a wonderful wife and young family,

12   that's a really great position to be in, in this world.

13         And it's -- it's -- certainly Mr. Mingarelli -- the

14   Court may want to sentence him to some time because the other

15   people in this case have done some time, but Mr. Mingarelli

16   really shouldn't be doing much of any more time than the other

17   people have who were involved in this conspiracy, he's -- he

18   -- because he had changed his life, because of what he has to

19   look forward to in this life.

20         And that's one of the real problems here is these

21   are all really kids that are appearing before the Court, Your

22   Honor, and the crisis and the situation that's so horrible

23   here is you have these doctors and you have these pharmacies

24   that really start this whole chain of events.  You have -- you

25   know, there's been people in the news like this Dr. Wetzler

1   (ph), you know, he distributes nine hundred thousand pills.

2   Well, that's like five hundred times what Mr. Mingarelli is --

3   is being accused of.  When someone like Dr. Wetzler gets put

4   in jail, that's taking five hundred people off the street.

5          And, you see, the problem is, is you have people,

6   pharmacists, you have doctors, they, for their own economic

7   gain, are preying on young people, they're prescribing these

8   pills, they're getting them addicted, and it starts this chain

9   reaction of events, and people get caught up in it, people

10  like Mr. Mingarelli and some of the other persons who have

11  been before the Court in relation to similar matters.

12         So, when it comes down to it, Your Honor, the

13  starting point for sentencing Mr. Mingarelli in this case

14  should be a calculation using oxycodone as equivalent to

15  morphine or as equivalent to five hundred grams of marijuana

16  instead of six point seven [6.7] kilograms.  Whichever method

17  the Court uses, it comes out the same under the guidelines,

18  and under Kimbro, the Court definitely has the discretion to

19  do that.  That puts Mr. Mingarelli in the forty-six to fifty-

20  seven-month sentence range.

21         If the Court then makes variances or adjustments for

22  his family situation, for the fact that -- that he had changed

23  his life before this, and for other factors that may have been

24  pointed out in our supplemental sentencing memorandum -- I

25  mean, Mr. Mingarelli here has been very cooperative.  He has

1    acknowledged, he's accepted his responsibility, he -- you

2    know, he -- he -- he hates the fact that he's been in this

3    auto accident and it puts him back on -- he's prescribed on

4    oxycodone.  He actually hates oxycodone, he knows what

5    horrible things it did to his life, and it is a horrible

6    scourge, and -- and people need -- need to get some punishment

7    for it, but the real people that start this chain of events

8    are the doctors and the pharmacists.

9            Mr. Mingarelli got involved in that chain of events

10   and he recognized before he was apprehended this is wrong.  He

11   stopped doing it, he's trying to change his life around, and

12   he does accept responsibility for what he did, and does

13   recognize the Court is going to impose probably some term of

14   imprisonment on him.  But, you know, he may well miss his

15   child's terrible twos.  Mr. Mingarelli should, I believe, be

16   there for the third year of his child's life at some point in

17   time.

18           And a few other things.  If the Court is going to

19   sentence Mr. Mingarelli to -- to incarceration, we request

20   that the Court recommend or direct that he receive substance

21   abuse counseling to make sure he continues with his sobriety

22   in that regard.  We'd like the Court to direct that he be sent

23   somewhere near Las Vegas.  I believe there is a -- a place

24   called Nellis that's right near the area to be near his

25   family.

1    Another issue is if the Court is at all inclined and

2  Mr. Mingarelli requests that and discussed it himself, to

3  allow Mr. Mingarelli a thirty-day turn-in period.  He would

4  like to get physical therapy here in Fairbanks.  His -- his

5  grandfather of his wife would be willing to be a third party;

6  he could turn himself in here.  But I believe and -- and from

7  a criminal defense perspect and also someone who's handled

8  people with personal injury cases, that it's better to get

9  these things treated now then get him into jail that way so he

10  doesn't have to be on oxycodone for pain because the pain has

11  been cut short and dealt with through physical therapy early

12  on in -- in the -- in the event.

13    And if the Court will recall when -- when the doctor

14  was on the phone, he did indicate that he thought Mr.

15  Mingarelli probably should have a -- several weeks of therapy,

16  maybe a month or so would be the optimal thing to get before

17  Mr. Mingarelli turns himself in.

18    So, in that regard, I -- I pointed out things in the

19  sentencing memo.  I believe the Court would be affirmative

20  order -- oppose a probationary sentence.  If the Court is

21  going to give some time, I don't think Mr. Mingarelli should

22  receive more or much more than the other people have had in

23  this conspiracy.  He -- he's a use -- (indiscernible) used,

24  they're all caught up in this thing, and it's unfortunate that

25  Mr. Mingarelli recognized the errors of his way and -- and was

1  going on a very good path before this -- this came around and

2  caught up with him, and he's accept -- willing to accept the

3  consequences and acknowledges his responsibility, and -- and

4  we'll request the -- the mercy of the Court.  Thank you.

5  THE COURT:  So, where did you say you thought he

6  should serve his time, in Las Vegas?  I didn't hear the

7  name --

8  MR. JOHN:  I think it was called Nellis, I

9  believe --

10  THE COURT:  Nellis?

11  MR. JOHN:  Nellis, N-E-L-L-I-S.  I believe it's by

12  an Air Force base there.  I believe there's --

13  THE COURT:  And it's a federal penitentiary?

14  MR. JOHN:  That's what I -- that's what I under -- I

15  spoke with Mr. Mingarelli --

16  THE COURT:  Well, I don't know what -- I don't know

17  what level of detention that is.  I don't know if it's a --

18  MR. JOHN:  I don't know exactly either, Your Honor.

19  THE COURT:  Okay.

20  MR. JOHN:  I was just discussing with Mr.

21  Mingarelli.  I don't know.  That's something I did not have a

22  chance to --

23  THE COURT:  Well --

24  MR. JOHN:  -- to explore.

25  THE COURT:  -- it seems to me that he should be in a

1  place where he can take advantage of a drug and alcohol

2  program.  I don't know if they have it there.  And maybe you

3  can get out early by doing that.  I don't know, given his

4  history.  So, I hate to recommend a place that might not be in

5  his best interest, although I can understand why it would

6  certainly help -- will be near his family, but we -- we'll

7  cross that bridge when we get to it.

8          MR. JOHN:  Okay.

9          THE COURT:  Okay.

10         MR. JOHN:  Yes, Your Honor.  I'd like you to take in

11 the fact Mr. Mingarelli's conduct subsequent to the offense

12 and prior to apprehension, and also the fact of his family

13 circumstances in imposing a sentence, and we'd request

14 leniency from the Court.

15         THE COURT:  Okay.  Well, I don't know if Mr.

16 Mingarelli has really demonstrated the kind of rehabilitation

17 that you say he has.  I have a report from the probation

18 officer indicating that he was using methamphetamine within

19 the last week.  So, what do you have to say about this, Mr.

20 Mingarelli?  Just take your time.  Pull the microphone up.

21         MR. JOHN:  We can talk about this and address it

22 there.

23                    (Pause)

24         THE COURT:  Just be comfortable.  Just say --

25 you're --

1      MR. JOHN:  Whatever's more comfortable for you.

2      THE COURT:  I need to know what the heck you --

3  what's going on in your mind.  I know a lot of -- see, I know

4  a lot about you, more than you might think I know about you,

5  so I don't want to play any games.  This is your last chance

6  to speak.

7                  **DEFENDANT'S ALLOCUTION**

8      THE DEFENDANT:  I understand.  I was -- the day that

9  I was -- I was -- I was sentenced on the phone with you --

10      THE COURT:  Yeah?

11      THE DEFENDANT:  -- I was -- I was scared.  I did

12  relapse that one time, and that was --

13      THE COURT:  I don't know how you can get

14  methamphetamine.  I mean, you know how you can, but you've got

15  to do something, you don't just pick it up at the grocery

16  store.  It's something that you actually went out of your way

17  to find it and then you snorted it, and here you're -- 21st of

18  February or 12th -- yeah, 21st of February.  What's today, the

19  24th?  Three days ago.  So, it's hard for me to believe that

20  you're as rehabilitated as everyone wants me to believe.

21  You've been -- I mean, people don't give meth away, so you had

22  to pay for it.

23      THE DEFENDANT:  It was a -- it was a --

24      THE COURT:  You know, you don't have to say

25  anything, but this is your last time to speak, so I just want

1  you to be comfortable and just tell me what you think I need

2  to know to impose a fair sentence because you're looking at a

3  sentence -- if I look at the sentencing guidelines, of

4  nineteen years in jail, minimum.  So, I don't want to -- you

5  know, I don't want to throw you through that if there's some

6  redeeming qualities to you, but you keep messing up after

7  messing up after messing up, and I wonder.

8          THE DEFENDANT:  It was -- it was -- I was scared, it

9  was my -- the first relapse and -- and, you know, I've been on

10  -- on pretrial for about a year and a half.

11          THE COURT:  I know you've -- I will agree with you

12  there.  You went for a period of time doing pretty well.

13          THE DEFENDANT:  And -- and -- and just I was scared

14  and -- and I did, I relapsed.

15          THE COURT:  Well, how does being scared justify

16  going out, finding a drug dealer, taking some money out of

17  your wallet that probably should have gone somewhere else, and

18  then snorting meth?

19          THE DEFENDANT:  It (indiscernible - simultaneous

20  speakers) --

21          THE COURT:  How does that -- I mean does that make

22  you feel better?  Maybe for a moment, I guess.

23          THE DEFENDANT:  Maybe for a moment it did, it took

24  my mind off everything.  I -- I -- I don't -- I don't have an

25  excuse for --

1    THE COURT:  Okay.  Well, let's forget about that.

2  Tell me more about why you shouldn't go to jail for nineteen

3  years.

4    THE DEFENDANT:  I have -- I think first and

5  foremost, you know, I -- I -- I'm truly remorseful for

6  everything that I've done, and I think --

7    THE COURT:  Well, wait.  Can -- you see, the thing

8  is I know about what you've done and I know when it started,

9  and it started a long time ago.  I know you're a drug addict,

10  I know you're a drug dealer, I know you've been thieving from

11  time to time in your life, I know that you've got a gambling

12  habit, and much of your adult life has been spent on the

13  fringes of -- of the law.  That's just and truth now, and

14  everybody says you're a good guy, you're a great guy, this guy

15  shouldn't go to jail.  How can I deal with that, you know,

16  when I know what you've done?

17    THE DEFENDANT:  I understand.  I have -- I have two

18  daughters --

19    THE COURT:  You know, and I keep -- I'm going to let

20  you talk, but ninety percent of the people I send to jail have

21  kids, so that's not an excuse.  But I understand that.  I -- I

22  mean, unfortunately, families always are hurt most when --

23  when a member of the family chooses to do these kinds of

24  things, all the time, but it's not even a sentencing factor.

25  I guess it is, it's something I can consider, but it -- but I

1    want to hear from you, and then we'll just talk about it,

2    okay?

3            THE DEFENDANT:  Yeah, the actual -- the meth but was

4    -- it was given to me.

5            THE COURT:  Okay.

6            THE DEFENDANT:  I didn't go seek it out.

7            THE COURT:  Okay.

8            THE DEFENDANT:  And -- and I'm not making any

9    excuses for -- it did happen and -- and I did relapse and, you

10    know, I apologize for that.  I -- I am a changed person.  I

11    changed my life around --

12            THE COURT:  Changed since -- since February 21st

13    or --

14            THE DEFENDANT:  I changed my -- from before that

15    when -- when I met my wife.  These charges that -- that -- you

16    know, they were from awhile back, and --

17            THE COURT:  Your wife's lucky she didn't get charged

18    with some of this stuff.

19            THE DEFENDANT:  I -- I mean, I -- I'm sorry, I'm

20    still a little nervous.

21            THE COURT:  I -- listen, I know you're nervous.  I'd

22    be scared to death if I were you, but don't worry about it.

23    If you want -- just pretend like we're sitting in a room

24    talking because I need to know, and -- and I -- this is your

25    chance.

1          THE DEFENDANT:  I -- I have -- I have -- I do have

2    -- I have a bright future ahead of me with computer

3    programming.  I happen to be very good at it.  I have a very,

4    very -- contacts that -- that I'm associated with that -- that

5    aren't in the drug industry that -- you know, straight

6    business contacts.

7          I -- this is -- you know, nothing's that's --

8    nothing positive has come out of my life with -- with the

9    illegal activities and I'm done with it.  I'm done with it.

10   And -- you know, I -- I just -- I want to -- I want a chance

11   to be there and to raise my -- my daughters (indiscernible -

12   emotional).  I'm sorry, I'm sorry.

13         THE COURT:  Try to think of this, you know, because

14   everybody is concerned about their own kids, but what about --

15   what about if someone approached your daughters and tried to

16   do this to them -- tried to addict them?

17         THE DEFENDANT:  I would be -- I would be --

18         THE COURT:  You'd be pretty upset about it, wouldn't

19   you?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Because you know what drugs can do to

22   people.

23         THE DEFENDANT:  Yes, sir.  That's why I want no

24   part --

25         THE COURT:  That's the problem we've got as a

1  community.  We know what drugs do, too, and we have daughters

2  and sons and family, and when we see people out there that

3  will for money try to addict them and then ruin their lives,

4  it just -- it just makes you mad, and that's why you've got

5  these serious laws because we're trying to stop it, for the

6  sake of our kids if nothing else.

7          THE DEFENDANT:  Right.  I -- I understand.  You

8  know, the individuals that -- that -- that I -- I was dealing

9  with, these individuals were -- you know, they were -- they

10 approached me, you know?  They were -- there were addicted,

11 they approached me, and -- and I'm not justifying, you know,

12 that's -- you -- you know, but they -- they -- it wasn't like

13 I -- I went out and tried to -- to get people addicted to

14 drugs and -- and tried to -- tried to ruin their lives, you

15 know?  And -- and I -- I still go back for who distributed to

16 me even -- you know, even -- because they were addicted.

17          I -- I -- this is a part of my life I -- I -- I want

18 done, I'm over with.  And, you know, he said, you know, I -- I

19 would be terribly upset if somebody approached my daughter and

20 got her addicted to drugs, you know?  And that's why I want to

21 be there if she's -- I mean, my one daughter's eight months

22 years old, but my other daughter is nine and, you know, if I

23 get nine years or something -- something -- you know, these

24 are the most important times, you know, in her life that are

25 coming up, you know, the age -- that I want to be there to

1   make sure something like this doesn't happen to her, you know?

2          And because of -- you know, of -- of my upbringing,

3   you know, I'm -- I will be well aware of it, I would be able

4   to protect her, you know?  I would know if she was on drugs,

5   you know?  And I -- I -- I could tell you right now, Your

6   Honor, I -- I will never re-offend ever again.  I -- I -- I

7   can't tell you how serious I am (indiscernible - emotional)

8   tell you that.

9          THE COURT:  Well, but you just -- just two days ago,

10  you got scared and you re-offended.

11         THE DEFENDANT:  I -- I -- I --

12         THE COURT:  Just two days ago.  And you had -- and

13  -- and, you know, it wasn't like selling to everybody, but you

14  had a specific provision in your release conditions that said

15  you will not use drugs.  You know that.  And -- and the thing

16  is, you had to have known you were going to get caught.  It

17  was like so obvious that they'd catch you.  They -- you have

18  to go in for these tests, and you look -- you know, you look

19  stoned.  As far as the probation officers are concerned, they

20  could tell something was wrong with you.

21         So, anyhow -- you see my problem?  I've got your

22  history sitting all over in front of me.  And I also -- you

23  know, I'm not -- I'm not just looking at one side of the page.

24  I saw the letters from your employers.  I recognize you're a

25  talented computer programmer, I recognize that there are

1   legitimate things you can do legally to make a living, that

2   you don't have to be out there selling drugs, and that you've

3   got family and -- and friends that support you.  I know all

4   that, but I also know the other part of you.

5           THE DEFENDANT:  I --

6           THE COURT:  So, that's where we sit today.  But you

7   -- you know, you -- I'm -- I'm here to listen if you have more

8   to say.

9           THE DEFENDANT:  I just -- I just ask, you know, the

10  Court to -- to understand, you know, you -- you're looking at

11  both sides of it and I just ask for you guys to give me a

12  chance.  You know, give me a chance to -- to -- to -- to show

13  you I mean -- I mean, you know, a minimum sentence.

14          And -- and I know that's asking a lot because of,

15  you know, what I've done and -- and -- and I understand that,

16  and -- but, you know, give me a chance or, you know, even --

17  you know, even with -- what is it?  When you get out, it's --

18          THE COURT:  Supervised release?  They don't --

19          THE DEFENDANT:  Yeah, supervised release.

20          THE COURT:  Yeah.

21          THE DEFENDANT:  And -- and, you know -- and -- and

22  -- and you can give me a twenty-year sentence if I mess up on

23  that, and I'm willing to -- to take that because I -- I mean,

24  that's how confident that -- that I am that I won't -- I won't

25  re-offend.

1    I mean, nothing -- the mistakes that I've made in my

2  life and the criminal activity, nothing positive has come out

3  of it, nothing, and -- and I want it -- done with it.  And --

4  and I -- you know, besides my relapse, I was done with it

5  before -- before these charges, you know, were ever -- were

6  ever brought up, this -- I changed my life around when I met

7  my wife and -- and -- and we had a daughter and -- and, you

8  know, I just want to raise her and I want to raise my other

9  daughter the right way and -- you know, obviously, this is a

10  -- this has taken a toll on me mentally over the last year and

11  a half like -- like nothing else in my entire life.

12          THE COURT:  Okay.  Anything else?

13          THE DEFENDANT:  You know, I -- when I get out, you

14  know, I -- I have a business that I'll be -- you know, we'll

15  be running with two of my -- two -- two -- two of my partners,

16  so I have -- I have -- I have -- you know, like I said a good

17  future.  I have -- I have -- you know, and -- and I want to

18  take college courses, you know, if I do get sent away, and

19  I'll take every advantage, you know, and I won't waste one

20  second while I'm in there.

21              (Pause - side conversation)

22          THE DEFENDANT:  I mean, I -- I don't know what to

23  say.  I just -- I just wish the Court would give me a chance

24  to --

25                    **COURT'S COMMENTS**

1       THE COURT: Okay. All right. Well, thank you very

2  much. I appreciate your comments. I've looked at this --

3  I've prepared for this sentencing several times because it got

4  -- kept getting put off. I think I have a pretty good

5  understanding of both sides of the issue as I begin. The

6  concern is we have to look at who you are, what you've done,

7  and then a number of sentencing factors.

8       And it's clear by looking at your history that

9  you've been a drug addict for quite some time, having --

10 having challenges in that regard for much of your adult life,

11 and that you've been dealing drugs periodically and have been

12 in fact caught dealing drugs, and that's why you're here in

13 Alaska.

14      And there are histories where you've actually been

15 stealing, and I suspect that was in large part due to

16 addressing either your drug habit or your gambling habit

17 because that's another -- you apparently have an addictive

18 personality and you make choices that take you outside the

19 bounds of the law and that jeopardize whatever community

20 you're in, whether it be in Las Vegas or Fairbanks, Alaska.

21 And that's unfortunate, but that seems to be what you've

22 chosen to do with your life up to this point in time.

23      In addition, you're responsible for involving a

24 significant number of other people involved -- young people.

25 So, it's a bunch of young people who are doing stupid things

1    in order to make a quick buck, and it -- you know, it seems --

2    might seem fine to you, but it hurts us, the community.  It

3    hurts the mothers and fathers, parents and grandparents of --

4    of those who have to deal with the horrible, horrible

5    challenge of having a family member addicted and subject to

6    this kind of thing.  So, the community is -- is -- is being

7    hurt.

8            And this new kind of drug -- these new drugs,

9    oxycodone and these other things, these new designer drugs

10   that you start to see, they're -- they're especially bad, and

11   people get addicted very quickly, and they throw their life

12   away; souls are basically lost to the drug dealers.  And

13   that's where you sit, right there, you did it, and you got

14   caught.

15           So, we know that, and you received at least over a

16   hundred thousand dollars, up to a hundred and forty thousand

17   dollars, in drug proceeds.  That's money that came out of

18   someone's pocket that should have been going to feeding their

19   kids or paying their car payment, but it went to getting high

20   and it went to Las Vegas to you.  And so the community is

21   certainly damaged as a result of this, and a lot of people are

22   feeling the pain because of their involvement in this drug

23   conspiracy.  That's just simply the facts of life.

24           Now, for some reason, the Government has chosen to

25   treat you leniently.  They charged you just with a conspiracy

1    to launder proceeds of unlawful drugs, not with the conspiracy

2    to sell drugs.  They -- and the probation officer pointed out

3    your -- your age and the relatively short period of time of

4    the conspiracy, at least that we know about.  I'm always

5    impressed by the lack of violence, and in your case by the

6    efforts to assist or to cooperate with authorities early on.

7    Those are all positive things.

8           I'm also -- I -- I -- I was frustrated that this

9    thing continually got put off, but at least you've shown up

10   and you don't have to be drug in here.  So, those are all

11   positive things.  You have -- you're talented in the sense you

12   have skills.  You don't have to be a drug dealer, you chose to

13   be a drug dealer, but you don't have to be a drug dealer.

14          And hope -- like I tell people all the time, I don't

15   know what it's like in Las Vegas, but here in Alaska, we don't

16   need any more drug dealers.  We need people that can do good

17   things, that can help our community.  We've got all the drug

18   dealers we could ever use, but we just don't need them

19   anymore, and the community doesn't tolerate it and, you know,

20   the message that we continually get from the citizens

21   throughout the country is lock these people up, throw them

22   away, they're hurting our community, they're hurting our

23   families, we can't mess with it anymore, we don't want to mess

24   with them anymore.

25          So, that's the group of people you put yourself in

1    when you chose to be a drug dealer.  Not as bad as the -- as

2    the sexual offenders that I get, the child predators, they're

3    -- they're pretty bad.  You're not in that category.  But I'll

4    tell you, when people start talking about drug dealers, they

5    don't have a great deal of sympathy, and that's just the facts

6    of life.

7           So, I agree with the Government that the sentencing

8    in this particular -- and with your attorney, that the

9    sentencing range that's provided by the guidelines of nineteen

10   years and more in jail is -- is probably inappropriate given

11   your situation, given the demonstrated remorse that you've

12   indicated today, and in your activities in the last year, but

13   I don't think that the probation officer and the Government's

14   recommendations are that far off when they recommend the

15   ninety-six months.  It's certainly reasonable.

16          I know I'm going to give you even a break beyond

17   that and I'm going to sentence you to eighty months, and the

18   only reason I'm coming down below that is because I notice

19   that these -- I -- I consider what the other defendants

20   received as well.  I'm going to recommend that you participate

21   in a drug and alcohol program, and hopefully you'll get some

22   time knocked off your sentence as a result of that.

23          Hopefully, you'll -- you'll earn good time while

24   you're in prison and get out earlier than this.  That'll be up

25   to you though.  You have to -- you have to -- you have to quit

1  -- quit talking and start doing.  Does that make sense?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Okay.  And the reason we impose

4  sentences like this, I want you to understand, is we want to

5  make sure you don't do this again.  We want to deter you, we

6  want to deter other people, we want to reinforce community

7  norms, and let it be known that this is not tolerated.  But

8  the reason you get a break, the reason we're giving you a

9  variance, is because you've demonstrated, at least in part,

10  through willingness to change and that you can be

11  rehabilitated.  That's why we're not looking at nineteen

12  years.  We're looking at a lot less.

13          We're giving you a chance to, A, you've got to pay

14  the price, you have to have respect for the law.  If you

15  don't, you've got to pay the price, and that's what you're

16  doing, but that's the first step, pay the price.  That's the

17  punishment.  We'll see what you do while you're in custody?

18  Will you go to school?  Will you do those things?  Will you

19  avoid the -- the -- the problem people and be one of the good

20  people?  Will you really demonstrate by how you conduct

21  yourself that you are a changed man?  That's a big question

22  mark for all of us, and we'll just have to see.

23          So, when I consider all the sentencing factors, I

24  think that this sentence -- this eighty-month sentence is

25  sufficient, but not greater than necessary to satisfy the

sentencing goals.  So, let me make it official.

**IMPOSITION OF SENTENCE**

THE COURT:  Pursuant to the Sentencing Reform Act of 1984 and considering the factors found in 18 U.S.C. §3553(a), it is the judgment of the Court that the defendant, Damien Michael Mingarelli, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of eighty months.  Upon release from imprisonment, the defendant shall be placed on supervised release for three years.  Within seventy-two hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another federal, state or local crime, shall not possess a firearm or illegal controlled substance, and shall comply with the standard conditions that are included in the judgment issued by the Court.

Additionally, as the offense occurred after the effective date of the Violent Crime Control and Law Enforcement Act of September 13, '84 [sic], and the Court finds there is a risk of future substance abuse, the defendant shall refrain from the unlawful use of controlled substances and shall submit to one drug test within fifteen days of release on supervision, and at least two periodic drug tests thereafter, not to exceed twelve tests per month, as directed

1    by the probation officer.

2            The defendant shall also comply with the following

3    special conditions:

4            The defendant shall cooperate in the collection of a

5    DNA sample from the defendant as directed by the Bureau of

6    Prisons prior to release or by probation officer upon release.

7            In addition to submitting to drug testing in

8    accordance with the Violent Crime Control and Law Enforcement

9    Act of '94, the defendant shall participate in an outpatient

10   treatment program approved by the United States Probation

11   Office for substance abuse treatment, which program shall

12   include testing to determine whether the defendant has

13   reverted to the use of drugs or alcohol.  At the direction of

14   the probation officer, the defendant may be required to pay

15   for all or a portion of any treatment program.

16           The defendant shall submit to a warrantless search

17   of his person, his residence, his vehicle, his personal

18   effects, his place of employment and other property by a

19   Federal Probation or Pretrial Services Officer or other law

20   enforcement officer based upon reasonable suspicion of

21   contraband or a violation of a condition of supervision.

22   Failure to submit to a search may be grounds for revocation.

23           The defendant shall not possess a firearm,

24   destructive device, or other weapon.

25           The Court finds the defendant does not have the

1    ability to pay a fine or community restitution.  It is further

2    ordered that the defendant shall pay to the United States a

3    special assessment of one hundred dollars which shall be paid

4    immediately to the Clerk of Court.

5             The Court will strongly recommend that defendant be

6    able to participate in the five-hundred-hour DAT program.  The

7    defendant [sic] would recommend that defendant be able to

8    serve his -- his time in a facility located near Las Vegas,

9    Nevada, providing, of course, that -- he's -- he qualifies for

10   that facility and it offers him the benefits that I've just

11   addressed with regard to substance abuse counseling.

12            Further ordered that defendant will be remanded to

13   the custody at this time.

14            Now, sir, you have a right to appeal your sentence,

15   and I'm going to make -- read that to you:

16            You're advised that you may appeal your sentence on

17   any of the grounds mentioned in 18 U.S.C. §3742.  If you

18   cannot afford to take an appeal, you may ask to do so at

19   public expense by applying for leave to appeal in forma

20   pauperis.  If you request it, the Clerk of Court will prepare

21   and file a notice of appeal on your behalf.  If you wish to

22   appeal, you must do so within the fourteen-day time period

23   allowed by Rule 4(b) of the Federal Rules of Appellate

24   Procedure.

25            So, I think that covers it.  Does the Government

1  have anything else?

2  MR. BOTTINI:  We do not, Your Honor.  Thank you.

3  THE COURT:  Did you -- you heard everything?

4  MR. BOTTINI:  I did.

5  THE COURT:  Okay.  Probation officer, did you catch

6  everything?

7  THE PROBATION OFFICER:  Yes, Your Honor.  Thank you.

8  THE COURT:  Any changes, additions, or suggestions?

9  THE PROBATION OFFICER:  No, Your Honor.

10  THE COURT:  Mr. John, anything?

11  MR. JOHN:  Your Honor, just to make clear.  You were

12  not accepting my argument about the -- the calculation for

13  oxycodone under the guidelines?

14  THE COURT:  No, I think it's interesting.  I

15  consider all these things, but I think that the guideline -- I

16  begin with the guideline calculation, which I think was

17  adequately prepared by the probation officer and is addressed

18  in his presentence report.  That's the beginning point, it's

19  not determinative.  I obviously went down considerably.  I

20  didn't sentence him between two hundred and ten and two

21  hundred and forty months.  I sentenced him way below that

22  because of any number of other factors which I've mentioned

23  here, specifically the §3553 factors, but also the youth and

24  the fact that this -- you know, some of the arguments that you

25  made were somewhat persuasive.  Otherwise, I would have

1  sentenced him to ninety-six months or more.  Okay?

2          MR. JOHN:  Yes.  One more thing, Your Honor.  I

3  would reiterate Mr. Mingarelli's request for a thirty-day

4  period for self-surrender.

5          MR. BOTTINI:  Oh, we (indiscernible - simultaneous

6  speakers) --

7          MR. JOHN:  He'll remain in Alaska during that period

8  of time.

9          THE COURT:  I'm going to deny that.  I've given him

10 more breaks than you can -- well, you know.  He changed in

11 plea in April of -- it'll be a year and we've been still --

12 you know, messing around trying to get him sentenced for

13 almost a year.  He needs to -- you know, the longest journey

14 begins with a single step, and today is the first step in this

15 journey, which hopefully will lead in a good result for him

16 and his family.  Thank you all very much.

17         MR. JOHN:  Thank you, Your Honor.

18         MR. BOTTINI:  Thank you.

19         THE CLERK:  All rise.  This matter is now adjourned.

20 This Court's in recess until 2:15.

21     (Proceedings concluded at 2:01 p.m.)

22

23

24

25

```
 1                              INDEX

 2                                                        Page

 3    GOVERNMENT'S SENTENCING RECOMMENDATIONS:  Mr. Bottini     5

 4    DEFENDANT'S SENTENCING RECOMMENDATIONS:  Mr. John         7

 5    DEFENDANT'S ALLOCUTION                                   20

 6    COURT'S COMMENTS                                         28

 7    IMPOSITION OF SENTENCE                                   34

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              **CERTIFICATE**

2      I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3      entitled matter.

4

5          /s/ D. Kathleen Stegmiller             05/15/2012
     D. Kathleen Stegmiller, Transcriber            Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25